IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MICHAEL D. WILKINS,

        Petitioner,

                                   CIVIL ACTION
    vs.                            No. 09-3182-SAC

DAVID McKUNE, Warden, et al.,

        Respondents.


MEMORANDUM AND ORDER

      This matter comes before the court on a petition for habeas corpus filed pursuant to 28 U.S.C. § 2254. Petitioner alleges he was denied a fair trial due to the failure of the prosecution to disclose exculpatory evidence to the defense.

**Background**

*Procedural history*

      Petitioner was convicted in July 1996 in the District Court of Jefferson County, Kansas, of one count of murder in the first degree, one count of conspiracy to commit murder in the first degree, one count of aggravated robbery, and one count of conspiracy to commit aggravated robbery. He was sentenced to life in prison with parole eligibility in 15 years for the murder conviction and to a controlling, consecutive sentence of

172 months on the remaining convictions.

In May 1999, the Kansas Supreme Court affirmed petitioner's convictions of first degree murder, conspiracy to commit first degree murder, and aggravated robbery. The Court reversed the conviction of conspiracy to commit aggravated robbery. As a result, petitioner's sentence was modified to a term of life plus 122 months. *State v. Wilkins*, 985 P.2d 690 (Kan. 1999).

In May 2003, petitioner filed a state post-conviction action pursuant to K.S.A. 60-1507 in the state district court, alleging his trial counsel was ineffective on grounds including the failure to file any formal discovery requests, instead relying entirely on the prosecutor's open file policy. He also alleged the prosecutor withheld exculpatory evidence including the grant of immunity to Charles Gray, the results of Gray's polygraph examinations, and the plea agreement entered with petitioner's co-defendant Mike Bittle.

The district court conducted an evidentiary hearing and denied relief. Petitioner appealed, and the Kansas Court of Appeals ordered a new trial. *State v. Wilkins*, 146 P.3d 709, 2006 WL 3409418 (Kan. App. Nov. 22, 2006)(unpublished decision).

In August 2008, however, the Kansas Supreme Court reversed that decision and affirmed the denial of relief on petitioner's claims concerning the ineffective assistance of counsel, the

failure to disclose certain documents, and the failure to produce two polygraph examination reports.  *Wilkins v. State*, 190 P.3d 957 (Kan. 2008).

**Factual history**

The facts in this matter are not in dispute.  The court adopts the facts as summarized by the Kansas Supreme Court:

> In brief, Wilkins' 1996 convictions involved murder, sex, drugs, and the Ku Klux Klan.  He had been recruited to be an enforcer and assistant to Klan group leader Mike Bittle.  Bittle later turned his Klan position over to a friend, moved to Iowa, and began a new career growing marijuana; but he and Wilkins remained in touch.
>
> The man who would later become the murder victim, Shipley, persuaded Bittle to set up Klan activities in Iowa.... Shipley moved in with Bittle; started sleeping with Bittle's girlfriends; raped a Klan initiate with whom Bittle wanted to have sex; and generally attempted to replace Wilkins as Bittle's assistant. None of these behaviors sat well with Bittle or Wilkins. In addition, because Bittle had been slow to repay a loan from Shipley, Shipley threatened to report Bittle's marijuana growing operation to law enforcement.
>
> In the summer of 1993, Bittle, his wife and girlfriends, Wilkins, Shipley, and another man named Charles "Doug" Gray met at a Missouri motel. Bittle told Wilkins and Gray that he was tired of Shipley causing friction and that he did not want to see Shipley anymore. According to Bittle, Wilkins then asked, "'What do you mean, kill him?'" Bittle then replied, "'Do what you have to do, I just don't want to see him anymore.'" 267 Kan. at 358, 985 P.2d 690. Bittle also told Wilkins to bring him a necklace Shipley wore as proof that Wilkins had taken care of the Shipley problem. Wilkins, Gray, and Shipley then left the motel.

Wilkins returned later, told Bittle that Shipley was not going to be a problem anymore, and handed Shipley's necklace to Bittle. The group distributed some of Shipley's possessions and burned or otherwise disposed of the rest.

One of Bittle's girlfriends contacted police in late 1994 and reported what she knew about Shipley's evident murder. The resulting investigation languished until Gray, through an attorney, contacted authorities in early 1996 and demanded immunity in exchange for his cooperation. Gray agreed to wear a wire to gather information from Wilkins, but his two attempts to do so resulted in garbled recordings.

Gray took two polygraph tests for the Kansas Bureau of Investigation, and neither polygraph report was given to Wilkins or his counsel before trial. Each report contained the examiner's conclusion that Gray was being deceptive. Each report also mentioned that Gray had said in interviews that Shipley may not have been dead when Gray placed Shipley in a pond after Wilkins shot him. Gray ultimately received a promise of immunity in exchange for truthful testimony against Wilkins.

After Wilkins and Bittle were arrested in 1996, Wilkins suggested to Bittle that they cast all blame on Gray. In a note to Wilkins, which was intercepted and admitted at trial, Bittle agreed to implicate Gray. Bittle evidently reconsidered this choice, and he accepted a plea agreement in exchange for his testimony against Wilkins.

According to Gray, Wilkins had shot Shipley in the eye or head with Wilkins' .22 caliber long rifle. Gray and Wilkins then sank the body in a pond on Wilkins' mother's property in Jefferson County. Gray was the one who walked out in the pond and placed a rock in Shipley's shorts to weight them. Several months later, Wilkins told Gray that the body had surfaced and that Wilkins had scattered the bones; but Gray was able to lead officers to the pond, where remains were discovered.

Michael Finnegan, a forensic anthropologist, concluded

4

that the remains were that of a young white male, ranging in height from 5'8" to 5'11". Dr. Daniel Winter, a dentist, relying upon 11 teeth recovered from the scene, positively identified the remains as those of Shipley.

Detective Randy Carreno testified that police had recovered a .22 caliber long rifle from Wilkins' parents' house. When questioned about Shipley's disappearance, Wilkins told Carreno that Shipley went to Texas; he later stated Shipley was heading to Florida. When Carreno informed Wilkins that police had found the pond where Shipley's remains were hidden, Wilkins said, "Out by my Mom's." Carreno also told Wilkins police had recovered the murder weapon; Wilkins replied that he already knew this because his mother had called and told him. When Wilkins was asked if he would like to see the weapon, he declined, stating he already knew what the rifle looked like. *Wilkins v. State*, 985 P.2d at 963-64.

## Discussion

### Standard of review

This matter is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under the AEDPA, where a state prisoner presents a claim in habeas corpus and the merits were addressed in the state courts, a federal court may grant relief only if it determines that the state court proceedings resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding."
28 U.S.C. § 2254(d).

A state court decision is "contrary to clearly established
Federal law" when: (a) the state court "'applies a rule that
contradicts the governing law set forth in [Supreme Court]
cases'"; or (b) "'the state court confronts a set of facts that
are materially indistinguishable from a decision of [the Supreme]
Court and nevertheless arrives at a result different from [that]
precedent.'" *Maynard v. Boone,* 468 F.3d 665, 669 (10th Cir.
2006)(quoting *Williams v. Taylor,* 529 U.S. 362, 405 (2000)).

A state court decision involves an unreasonable application
of clearly established federal law where it identifies the
correct legal rule from Supreme Court case law, but unreasonably
applies that rule to the facts. *Id.* at 407-08. Likewise, a state
court unreasonably applies federal law, as determined by the
Supreme Court, where it either unreasonably extends, or refuses
to extend, a legal principle from Supreme Court precedent where
it should apply. *House v. Hatch,* 527 F.3d 1010, 1018 (10th Cir.
2008).

In order to obtain relief, a petitioner must show that the
state court decision is "objectively unreasonable." *Williams v.
Taylor*, 529 U.S. 362, 409 (2000)(O'Connor, J., concurring).

"The question under AEDPA is not whether a federal court

6

believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard v. Boone,* 468 F.3d 665, 671 (10th Cir. 2006).

Petitioner claims he was denied a fair trial due to the failure of the prosecution to turn over the immunity agreement reached with Gray, the pre-testing interviews, and the polygraph results.

In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

"To establish a *Brady* violation, the defendant must prove that the prosecution suppressed evidence, the evidence was favorable to the defense, and the evidence was material." *United States v. Erickson,* 561 F.3d 1150, 1163 (10th Cir. 2009). *Also see Snow v. Sirmons*, 474 F.3d 693, 711 (10th Cir. 2007)(same standard applied in habeas action under § 2254).

Undisclosed evidence is considered material where there is a reasonable probability that "had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682 (1985). The habeas court evaluates the materiality of the withheld evidence "in light of the entire record in order to determine if the omitted evidence creates a reasonable doubt that did not otherwise exist." *Snow,* 474 F.3d at 711 (quotation omitted). *See Trammell v. McKune*, 485 F.3d 546, 551 (10th Cir. 2007)(the "touchstone of materiality is a reasonable probability of a different result, which exists when the government's evidentiary suppression undermines confidence in the outcome of the trial.") (quotation marks and citation omitted).

Where the suppressed evidence "insignificantly impact[s] the degree of impeachment," such evidence ordinarily is not "sufficient to meet the ... materiality standard." *Douglas v. Workman*, 560 F.3d 1156, 1174 (10th Cir. 2009). Thus, where a witness's credibility "has already been substantially called into question in the same respects by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a *Brady* claim." *Nuckols v. Gibson*, 233 F.3d 1261, 1267 n.8 (10th Cir. 2000)(internal citation and punctuation omitted).

8

*Application*

Because petitioner's claims were litigated in the state courts, this court must determine only whether the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d).

The court first finds that the Kansas Supreme Court (KSC) applied the correct standard for the analysis of a claim under *Brady v. Maryland,* namely, that the evidence must be favorable to the accused, it must have been suppressed by the prosecution, and the suppression must have resulted in prejudice. *Wilkins*, 190 P.3d at 971-972 (quoting *Banks v. Dretke*, 540 U.S. 668, 691 (2004)(quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

The court next turns to whether the KSC unreasonably applied the *Brady* standard to the facts of petitioner's case.

The KSC found that despite the prosecution's failure to turn over to defense counsel the immunity agreement with Gray and the plea agreement with Bittle, the trial transcript demonstrates that petitioner's counsel was aware of these agreements and that they were discussed in front of the jury. *Wilkins*, 190 P.3d at 970.

Concerning the reports of the polygraph examinations taken

by Gray, the KSC determined the reports were not provided to the defense prior to trial and were exculpatory, as the determination of the polygraph examiner that Gray was deceptive undermined Gray's credibility and, in particular, his assertions concerning his own involvement in the murder. However, the KSC held that the polygraph report evidence was not material. First, the KSC found that polygraph results are inadmissible in Kansas. While the petitioner challenges that finding, this court need not resolve the issue, as it agrees that the reports, if admitted, would not have led the jury to a different verdict concerning the petitioner. The reports would undermine Gray's veracity and the degree of his participation in the murder. However, the KSC found that defense counsel had developed a case that showed both Bittle and Gray in a negative light, stating counsel "repeatedly established the criminal involvements and untrustworthy characters of both.... [and] proved that Bittle and Gray were involved in illegal drugs, prostitution, theft, and child pornography, while Wilkins was not." *Id.* at 971.

While Gray was the main witness against the petitioner, there was, as the KSC noted, considerable other evidence against petitioner, not least his statements to law enforcement officers that he knew the site of the pond near his mother's home where the victim was dumped, and that he knew that police had recovered

the murder weapon because his mother had told him. *Id*. at 969-70.

This analysis is more than sufficient to satisfy the standard of reasonableness set forth in 28 U.S.C. § 2254(d). Because the KSC applied the correct legal standard and reasonably applied that standard in evaluating the facts in this matter, the petitioner's request for habeas corpus relief must be denied.

IT IS, THEREFORE, BY THE COURT ORDERED the petition for habeas corpus is dismissed and all relief is denied.

Copies of this order shall be transmitted to the parties.

**IT IS SO ORDERED**.

Dated at Topeka, Kansas, this 24th day of May, 2012.


                            S/ Sam A. Crow
                            SAM A. CROW
                            United States Senior District Judge